IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| KAYLEE ENNIS-HASTINGS, | CASE NO. 1:23-cv-228 |
| Plaintiff, | DISTRICT JUDGE DAVID A. RUIZ |
| vs. | |
| COMMISSIONER OF SOCIAL SECURITY, | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| Defendant. | **REPORT & RECOMMENDATION** |

Plaintiff Ennis-Hastings filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying Disability Insurance Benefits and Supplemental Security Income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

In March 2021, Ennis-Hastings filed an application for Disability Insurance Benefits and Supplemental Security Income alleging a disability

onset date of December 1, 2020,[1] and claiming she was disabled due to clinical depression, post-traumatic stress disorder (PTSD), anxiety, obsessive-compulsive disorder (OCD), migraines, intervertebral disorder, hypertension, fatigue, audio processing disorder, tendinitis, carpel tunnel, acid reflux disease, and hyperreflexia.[2] Tr. 213, 220, 235. The Social Security Administration denied Ennis-Hastings's applications and her motion for reconsideration. Tr. 95–96, 119–20. Ennis-Hastings then requested a hearing before an Administrative Law Judge (ALJ). Tr. 149.

In January 2022, an ALJ held a hearing. Ennis-Hastings and a vocational expert testified. Tr. 42–70. In March 2022, the ALJ issued a written decision finding that Ennis-Hastings was not disabled. Tr. 15–36. The ALJ's decision became final on December 7, 2022, when the Social Security Appeals Council declined further review. Tr. 1–3; *see* 20 C.F.R. § 404.981.

Ennis-Hastings filed this action on February 6, 2023. Doc. 1. She asserts the following assignments of error:

> 1. The ALJ erred when she failed to discuss the opinion of the treating sources and failed to incorporate the stated limitations into her RFC.
>
> 2. The ALJ erred when she failed to properly evaluate Plaintiff's migraine headaches at Step Three of the Sequential Evaluation.

---

[1]     "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

[2]     Hyperreflexia is an exaggeration of reflexes. *See* Dorland's Illustrated Medical Dictionary, at 884 (33d ed. 2020).

3. The ALJ committed harmful error when she failed to properly apply the criteria of Social Security Ruling 16-3p and failed to find that the intensity, persistence and limiting effects of all Plaintiff's symptoms, including fatigue and extremity numbness, precluded her from performing substantial gainful activity on a full-time and sustained basis.

Doc. 7, at 1.

## Evidence

*Personal and vocational evidence*

Ennis-Hastings was born in 1997 and was 22 years old on her alleged disability onset date. Tr. 34. She has a high school education and no past relevant work. Tr. 34.

*Medical evidence*[3]

In February 2021, Ennis-Hastings visited Insight Counseling and Wellness for a behavioral health assessment, reporting a diagnosis of PTSD. Tr. 781. Ennis-Hastings described her depressive symptoms as sadness, loss of interest and pleasure, fatigue, restlessness, and feeling "keyed [up]." Tr. 781. She described anxiety symptoms of irritability, difficulty sleeping and concentrating, feeling tense and restless, and dissociative symptoms. Tr. 781. Ennis-Hastings also said that she heard voices and saw shadows. Tr. 785.

In early March 2021, Ennis-Hastings went to the Cleveland Clinic Headache and Facial Pain section of the neurology department for her complaints of headaches. Tr. 398. Ennis-Hastings stated that she had two

---

[3]     The recitation of medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs.

headache types that occurred a total of six times a month. Tr. 398–99. Her headaches occurred in the temporal and occipital regions of both sides of her head with photophobia, nausea, and sometimes phonophobia. Tr. 399. The doctor stated that Ennis-Hastings's symptoms were most consistent with episodic migraine with aura and prescribed medications. Tr. 403.

A few days later, Ennis-Hastings followed up with her orthopedic surgeon for bilateral hand numbness that improved with rest and worsened with use. Tr. 396, 388. The doctor referred Ennis-Hastings to a neurologist, whom Ennis-Hastings saw the next day. Tr. 388. The neurologist reviewed Ennis-Hastings's then-recent neuromuscular ultrasound, which showed "[e]vidence of possible entrapment of the right and left median nerves at the wrist." Tr. 388, 617. An EMG was negative. Tr. 388. The doctor opined that Ennis-Hastings's exam was benign, assessed intermittent mild bilateral carpal tunnel syndrome, and recommended that Ennis-Hastings follow up with the orthopedist. Tr. 390, 393. The doctor listed Ennis-Hastings's other assessments as: migraines, anxiety, PTSD, neck and back pains, obesity, obstructive sleep apnea, and polycystic ovarian syndrome. Tr. 393.

In late March 2021, Ennis-Hastings completed a function report. She wrote that she drove a car, performed light household chores, paid bills, and attended family events. Tr. 246–48.

In April 2021, Ennis-Hastings had a follow-up appointment for her headaches. Tr. 804. She reported that she had 12 headaches in March, three of

4

which were severe and "required treatment." Tr. 804. Within 15 minutes of taking medication, Ennis-Hastings "started feeling better." Tr. 804. The doctor stated that she would "hold off on starting a preventative medication for now" because Ennis-Hastings had an upcoming bariatric surgery. Tr. 806.

A lumbar spine MRI taken in early August 2021 showed that Ennis-Hastings had lumbar spondylosis, most pronounced at L1–2,[4] with a small left central disc protrusion and mild spinal canal stenosis. Tr. 976.

In late August 2021, Ennis-Hastings had bariatric surgery. Tr. 1023. The treatment note listed her pre-procedure diagnoses as morbid obesity and weight-related comorbidities, including migraines and joint pain. Tr. 1023.

In mid-October 2021, Ennis-Hastings was in a motor vehicle accident. Tr. 1405, 1104. Later that month, she had a spine surgery consultation for lower back pain. Tr. 1405.  She also reported intermittent leg pain and numbness and constant hand numbness. Tr. 1411. The doctor assessed Ennis-Hastings with chronic bilateral lower back pain with sciatica, myelopathy, cervical spondylosis without myelopathy, and bilateral hand numbness. Tr. 1411.

---

[4]     Vertebrae in a person's spine are given letter and number designations according to their location. The neck—the cervical spine—has seven vertebrae designated as C1 through C7. *See* Thomas Scioscia, MD, Vertebrae in the Vertebral Column, Spine-health Resources, https://www.spine-health.com/conditions/spine-anatomy/vertebrae-vertebral-column [https://perma.cc/R9MM-TBZT]. The twelve vertebrae compromising the upper spine—the thoracic spine—are labeled at T1 through T12. *Id*. The five vertebrae in the lower spine—the lumbar spine—are L1 through L5. *Id*.

5

On November 2, 2021, Ennis-Hastings had a neurology appointment, Tr. 1257, and followed up on November 9, Tr. 1134. The November 9 treatment note described Ennis-Hastings as having "vasovagal syncope[5] and migraines complicated by [the motor vehicle accident] with concussion." Tr. 1134. Ennis-Hastings reported that, when she drove home from her neurology appointment on November 2, she began to experience "ripping" pain in her elbow, shoulder, neck, left chest, torso, and left leg. Tr. 1134. The pain lasted for hours, resolved, and had not recurred. Tr. 1134. The provider ordered a brain and cervical spine MRI. Tr. 1137.

On November 13, Ennis-Hastings saw primary care provider Monica Cales, D.O., to establish care. Tr. 1103. Ennis-Hastings stated that she was "in the process of obtaining [d]isability for multiple diagnoses including POTS Syndrome,[6] PTSD, chronic back and knee pain as well as chronic pelvic pain." Tr. 1103. Ennis-Hastings detailed her medical history and symptoms from POTS, lumbar pain and radiculopathy, chronic pelvic dysfunction and pain,

---

[5]     Vasovagal syncope occurs when a person faints when the body overreacts to certain triggers. *See* https://www.mayoclinic.org/diseases-conditions/vasovagal-syncope/symptoms-causes/syc-20350527#:~:text=Vasovagal%20syncope%20(vay%2Dzoh%2D,blood%20or%20extreme%20emotional%20distress [https://perma.cc/HV6Q-GAAA]. The trigger causes the heartrate and blood pressure to drop suddenly, which leads to a brief loss of consciousness. *Id*.

[6]     Postural orthostatic tachycardia syndrome (POTS) is a condition that causes symptoms when one transitions from lying down to standing up, like a fast heart rate, dizziness, and fatigue. *See* https://my.clevelandclinic.org/health/diseases/16560-postural-orthostatic-tachycardia-syndrome-pots [https://perma.cc/4HTW-KX8N]

major depressive disorder, anxiety, OCD, PTSD, and carpal and cubital tunnel syndrome. Tr. 1103–04. Ennis-Hastings also reported her October 2021 motor vehicle accident "leading to concussion and exacerbation of chronic migraines with aura and chronic nausea," which, Ennis-Hastings stated, was "present [on a] daily basis" since she was 10 years old. Tr. 1104. Ennis-Hastings stated that she had lost 40 pounds since her bariatric surgery. Tr. 1107. She reported dizziness from POTS, tingling in her arms and legs, sensory changes (numbness in her toes), loss of consciousness, and migraines. Tr. 1107. On exam, Ennis-Hastings had a normal range of motion in her cervical spine and in "[g]eneral." Tr. 1108. Her neurological findings showed no focal deficit or weakness, normal coordination, and an abnormal gait, which Dr. Cales described as "slowed with caution sitting on the exam table." Tr. 1109. Ennis-Hastings's psychiatric findings were normal. Tr. 1108–09. Dr. Cales assessed Ennis-Hastings's migraines as not intractable, chronic, and stable with medications. Tr. 1109.

About a week later, Dr. Cales completed a physical medical source statement on Ennis-Hastings's behalf. Tr. 1428–31. Dr. Cales opined that Ennis-Hastings had work limitations inconsistent with work activity—Ennis-Hastings could stand, walk, and sit for less than two hours a day, could never lift ten or more pounds, could never reach with her arms, and could not tolerate even low stress work. Tr. 1429–30. Dr. Cales wrote that Ennis-Hastings took

no pain medication and used lifestyle management to control her POTS and vasovagal symptoms. Tr. 1428.

On November 30, 2021, Ennis-Hastings underwent a brain and cervical spine MRI, which were unremarkable. Tr. 1488–89. A few days later, Ennis-Hastings had a virtual appointment at the spine institute to review her MRI findings. Tr. 1466. Ennis-Hastings reported that, since her last visit a month earlier, she experienced left-sided pain and numbness. Tr. 1466. The provider noted Ennis-Hastings's unremarkable MRI and opined that Ennis-Hastings's spine was not contributing to Ennis-Hastings's symptoms. Tr. 1469. By that time, Ennis-Hastings had lost 61 pounds since her bariatric surgery. Tr. 1553.

In January 2022, Qualified Mental Health Specialist DeWanna Hull completed a mental impairment questionnaire on Ennis-Hastings's behalf. Tr. 1609–10. Hull opined that Ennis-Hastings couldn't meet competitive standards in certain areas of sustaining concentration and persistence and social interaction and was "seriously limited" in additional areas. Tr. 1609–10.

*State agency opinions*[7]

In May 2021, Abraham Mikalov, M.D., reviewed Ennis-Hastings's record and assessed Ennis-Hastings's physical residual functional capacity

---

[7]    When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability

(RFC).[8] Tr. 80–81. Dr. Mikalov opined that Ennis-Hastings could perform medium exertional level work—she could stand and walk for six hours in an eight-hour workday, sit for six hours, and lift, carry, and pull 50 pounds occasionally and 25 pounds frequently. Tr. 80. Ennis-Hastings also had postural, manipulative, and environmental restrictions. Tr. 80–81. In August 2021, Leslie Green, M.D., affirmed Dr.'s Mikalov's opinion. Tr. 102–04.

In April 2021, Vicki Warren, Ph.D., reviewed Ennis-Hastings's record and assessed Ennis-Hastings's mental RFC. Tr. 83. Dr. Warren opined that Ennis-Hastings could perform simple and routine tasks in an environment with few changes and relaxed production quotas. Tr. 83. She could interact with others on a superficial basis, with no mediating, negotiating, or directing others. Tr. 83. In September 2021, Paul Tangeman, Ph.D., affirmed Dr. Warren's opinion. Tr. 115–16.

*Hearing testimony*

Ennis-Hastings, who was represented by counsel, testified at the telephonic administrative hearing held in January 2022. Ennis-Hastings stated that she has a driver's license and drives about once a week to nearby

---

examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[8]     An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

doctor appointments. Tr. 46, 52. She has problems driving because her ovarian cysts "pop" and distract her. Tr. 46–47. She was also passing out more often. Tr. 47. Her doctors were "trying to get [her] license revoked" so that she doesn't pass out while driving. Tr. 47. Later in the hearing, Ennis-Hastings explained what she meant—a doctor she started seeing stated that Ennis-Hastings's POTS needs to be reported to "the Bureau," but Ennis-Hastings hasn't heard anything since her doctor reported it. Tr. 52.

When asked about her migraines, Ennis-Hastings stated that if she takes her medications, she has headaches about three times a week. Tr. 49–50. She takes medication every night and an emergency medication "when it's at its worst." Tr. 50. The emergency medication helps to offset the migraine so that it doesn't last as long. Tr. 50. When she takes the medication, she needs to lie down because it makes her very tired. Tr. 50. The medication helped for "the first hour" and then "it just comes back." Tr. 50. Ennis-Hastings can tell when a migraine is coming because she smells certain odors and is more sensitive to light and sound. Tr. 56–57. When asked what her doctors have recommended, Ennis-Hastings answered that her doctors are looking into "other researches" because "nothing [is] showing in the MRIs." Tr. 50. The doctors are "trying to figure out other plans." Tr. 50. Ennis-Hastings tried physical therapy and will try it again a month after the hearing. Tr. 50. The upcoming physical therapy will focus on her ear and neck, because an MRI showed fluid in her ear that her providers want to drain, and the providers

believe that Ennis-Hastings's neck is "the source of where all the pain is coming from for everywhere in [her] body." Tr. 58. Ennis-Hastings stated that her doctors also recently tried a new medication that made her more depressed and unable to function, so the doctors are "switching all the medications over once again." Tr. 50–51.

Ennis-Hastings stated that, two weeks before the hearing, her doctors changed her mental health medications. Tr. 51. The prior medications worked better than the current medications. Tr. 51. The medications don't completely take away her symptoms. Tr. 61. Ennis-Hastings sees her counselor once a week. Tr. 61. Ennis-Hastings said that she has nightmares every night and difficulty concentrating. Tr. 62.

When asked about dizziness and fatigue, Ennis-Hastings explained that she was diagnosed with POTS and that dizziness is also a symptom of her polycystic ovarian syndrome. Tr. 51–52. To treat her dizziness, Ennis-Hastings takes electrolytes and salt. Tr. 51. She mostly feels dizzy when "just standing up" or "going to sit down." Tr. 52. Bright lights while driving also cause dizziness. Tr. 52.

Ennis-Hastings said that since her gastric bypass surgery, she was passing out more often. Tr. 53. Usually, she passed out while sitting down. Tr. 53. "Every once in a while" she passes out when standing up—she "feel[s] it coming on" and tries to sit down before she falls. Tr. 53. Ennis-Hastings feels hot, her vision blurs, and she becomes dizzy. Tr. 53. This happens to her "about

11

every other hour to every two hours …, every day." Tr. 54. It takes about 20 to 30 minutes for the full episode to go away. Tr. 54. Ennis-Hastings later clarified that she rarely "actually pass[es] out" because she can sit down when she feels dizzy and "try not to." Tr. 60. When this happens, it feels like she's going to pass out, but she doesn't believe that she loses consciousness. Tr. 60.

Ennis-Hastings also has pain and numbness in her hands and feet every day. Tr. 55. Within seconds of sitting down, her legs and hands "go to sleep" and she can't move for over an hour. Tr. 55. She is stuck where she is until it goes away. Tr. 55. Ennis-Hastings can "barely stand up on [her] own" and will "just crash to the ground," so she tries to "make it to the bed so [she] can l[ie] flat," which helps. Tr. 55. She went to physical therapy and they gave her exercises, but the exercises didn't work. Tr. 55.

Ennis-Hastings estimated that she can stand and walk for about 10 minutes before she loses her balance. Tr. 56. She has various problems with her arms that cause her to drop things easily and prevent her from lifting much. Tr. 60. The heaviest she can lift and carry is ten pounds for four to five minutes. Tr. 60. She used to paint as a hobby, but at the time of the hearing she could barely concentrate on painting or her hands would "give out within the first five minutes." Tr. 62. Her husband performed most of the household chores, although Ennis-Hastings folds shirts every other week when she has the strength. Tr. 62.

12

The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Ennis-Hastings could perform work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 64. The vocational expert answered that such an individual could perform the following jobs: automobile detailer, store laborer, and hospital cleaner. Tr. 65.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2020.
>
> 2. The claimant has not engaged in substantial gainful activity since December 1, 2020, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> 3. The claimant had the following severe impairments: morbid obesity, status post gastric bypass surgery, degenerative disc disease of the lumbar spine with nonrotary curve to the left, herniated cervical disc, cervical spondylosis with myelopathy, bilateral carpal tunnel syndrome, episodic migraine headaches, reflex vasovagal syncope with predominant vasodepressor response, post-concussive syndrome, major depressive disorder, posttraumatic stress disorder (PTSD), generalized anxiety disorder, obsessive-compulsive disorder, and eating disorder (20 CFR 404.1520(c) and 416.920(c)).
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR

404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c), except she can frequently handle and finger on the left and right; never climb ladders, ropes, or scaffolds; should avoid concentrated exposure to dust, odors, fumes, and pulmonary irritants; should never be exposed to unprotected heights, dangerous moving mechanical parts, or operate a commercial motor vehicle; has the ability to carry out, concentrate, persist, and maintain pace for completing simple, routine, repetitive tasks that do not have strict production quotas; tolerate occasional changes in a routine work setting; superficially interact with others, superficial defined as work that does not involve any work tasks such as arbitration, negotiation, confrontation, being responsible for the safety of others, or directing the work of others.

6. The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born [in] … 1997 and was 22 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

> 11. The claimant has not been under a disability, as defined in the Social Security Act, from December 1, 2020, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 17–35.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

> 1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.
>
> 2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.
>
> 3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.
>
> 4. What is the claimant's residual functional capacity and can the claimant perform past

15

> relevant work? If so, the claimant is not
> disabled. If not, the ALJ proceeds to the next
> step.
>
> 5.  Can the claimant do any other work
> considering the claimant's residual functional
> capacity, age, education, and work
> experience? If so, the claimant is not disabled.
> If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d

417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the

burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden

shifts to the Commissioner at step five "to prove the availability of jobs in the

national economy that the claimant is capable of performing." *Id*. "The

claimant, however, retains the burden of proving her lack of residual functional

capacity." *Id*. If a claimant satisfies each element of the analysis and meets the

duration requirements, the claimant is determined to be disabled. *Walters*

*Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it

determines "that the ALJ has failed to apply the correct legal standards or has

made findings of fact unsupported by substantial evidence in the record."

*Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which

"a court … asks whether" the "existing administrative record … contains

'sufficien[t] evidence' to support the agency's factual determinations." *Biestek*

*v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial

evidence standard "is not high." *Id.* Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

*1.    Ennis-Hastings has forfeited her treating source argument*

In the "Facts" section of her brief, Ennis-Hastings spends less than three pages discussing the medical evidence. Doc. 7, at 2–4. In the "Argument" section of her brief, she relies on evidence that she didn't include in the *Facts* section of her brief, in violation of the Court's Initial Order. *See* Doc. 4, at 3 ("All facts relevant to the legal issues and discussion must be set forth in the

*Facts* section."). As relevant here, Ennis-Hastings's first argument is that the ALJ "failed to discuss the opinion of the treating sources and failed to incorporate the stated limitations into her RFC." Doc. 7, at 9. But Ennis-Hastings didn't discuss the treating source opinions in the *Facts* section of her brief. Indeed, Ennis-Hastings didn't even mention Dr. Cales, the treating source who rendered the opinion that she relies on in the *Argument* section of her brief, or identify Dr. Cale's opinion in the record. And while Ennis-Hastings mentioned in the *Facts* section of her brief that mental health provider DeWanna Hull completed a questionnaire on Ennis-Hastings's behalf, Doc. 7, at 4, Ennis-Hastings didn't describe any of Hull's findings.

Ennis-Hastings's counsel has been previously and repeatedly warned about this practice. *See, e.g.*, *Milliron v. Comm'r of Soc. Sec.*, No. 1:22-cv-1200, 2023 WL 4211041, at *8 n.10 (N.D. Ohio March 20, 2023), *report and recommendation adopted*, 2023 WL 4205214 (N.D. Ohio June 27, 2023); *Mencke v. Comm'r of Soc. Sec.*, Case No. 1:21-cv-2298, 2022 WL 2758577, at *1 n.2 (N.D. Ohio July 14, 2022). Because Ennis-Hastings has failed to comply with the Court's Initial Order to set forth in the *Facts* section of her brief the opinion evidence that serves as the basis for her first argument, she has forfeited her *treating source* argument.

### 2. *Even if the Court considers Ennis-Hastings's treating source argument, it fails*

Even if the Court considered Ennis-Hastings's argument, it fails. As an initial matter, Ennis-Hastings alleges that the ALJ "failed to discuss the

18

opinion of the treating sources[.]"[9] Doc. 7, at 9. But the ALJ spent more than a full page discussing the opinions of Ennis-Hastings's medical providers, Dr. Cales and Hull. Tr. 32–33.

The Commissioner is required to evaluate the persuasiveness of all medical opinions using the following factors: supportability; consistency; treatment relationship, including the length, frequency, purpose, and extent; specialization; and other factors. 20 C.F.R. §§ 416.920c(a), 416.920c(c)(1)–(5). *Supportability* and *consistency* are the most important factors. 20 C.F.R. § 416.920c(a). The Commissioner must explain the *supportability* and *consistency* factors when discussing a medical opinion. 20 C.F.R. § 416.920c(b)(2). The Commissioner is not required to discuss the remaining factors. *Id*. "A reviewing court evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Toennies v. Comm'r of Soc. Sec.*, No. 1:19-cv-2261, 2020 WL 2841379, at *14 (N.D. Ohio June 1, 2020) (internal quotation marks and citation omitted).

Here, the ALJ detailed each of Dr. Cales's assessed limitations and Dr. Cales's supporting rationale for the limitations. Tr. 32–33. The ALJ concluded:

> This opinion is not persuasive for several reasons.
> First, the opinion is inadequately supported, as it

---

[9] The "treating source rule," which generally required the ALJ to defer to the opinions of treating physicians, *see* 20 C.F.R. § 404.1527(c)(2) (2016), was abrogated by 20 C.F.R. §§ 404.1520c and 416.920c for applications, like Ennis-Hastings's, that were filed on or after March 27, 2017.

contains little narrative discussion of objective abnormalities on diagnostic testing or examination, as well as significant medical treatment, to support the limitations contained therein (*Id.*). In addition, the opinion is inconsistent with the remaining evidence of record, which contains findings of tenderness, decreased sensation, occasionally decreased lower extremity strength, occasionally abnormal reflexes, extremely large body habitus, and an abnormal gait, but normal range of motion, generally full strength, intact coordination, negative straight leg raising, and consistently independent ambulation on examination (Exhibit 2F, 4F, 7F, 9F, 10F, 11F, 13F, 14F, 16F, 17F). Furthermore, the opinion is inconsistent with the generally mild to unremarkable findings on diagnostic imaging/testing, and extremely conservative scope of medical treatment (*Id.*). As a result, the opinion is not persuasive.

Tr. 33.

Of the ALJ's three stated reasons, Ennis-Hastings only challenges the third reason—that Dr. Cales's opinion was "inconsistent with the mild to unremarkable findings on testing and conservative scope of medical treatment." Doc. 7, at 11 (citing Tr. 33). In support of her argument, Ennis-Hastings cites a tilt table test that confirmed her diagnosis of POTS. Doc. 7, at 11. But the ALJ recognized that Ennis-Hastings had a positive tilt table test and a resultant "reflex vasovagal syncope with predominant vasodepressor response" diagnosis. Tr. 25 (citing Tr. 1261). That positive tilt table test doesn't undercut the ALJ's finding that Ennis-Hastings had "generally mild to unremarkable findings on diagnostic imaging/testing." Tr. 33.

Ennis-Hastings concedes that "some of the objective testing was negative." Doc. 7, at 13. She cites "MRI evidence of problems with her spine," *id.*, but doesn't explain why she believes that the ALJ's characterization of her imaging as "generally mild to unremarkable" is inaccurate. *See also* Tr. 25 (ALJ discussing Ennis-Hastings's lumbar MRI, including a small disc protrusion and mild spinal canal stenosis), 27 (ALJ discussing Ennis-Hastings's cervical spine MRI as showing "no appreciable degenerative disease, and widely patent spinal canal and neural foramina"); *see also* Tr. 25 (ALJ noting two lumbar x-rays, one showing a mild curve but otherwise normal and a second that was "negative"; a negative EMG; a neuromuscular ultrasound showing "possible entrapment of the right and left median nerves at the wrist segment" but no evidence of other findings), 27 (ALJ listing unremarkable knee x-rays, an unremarkable brain MRI, and a normal "lower extremity anterior physiology study"). Finally, Ennis-Hastings doesn't explain why she disagrees with the ALJ's finding that she had an "extremely conservative scope of medical treatment." Tr. 33.

In short, Ennis-Hastings hasn't shown that the ALJ's characterization of her imagining and testing as "generally mild to unremarkable" was unsupported by substantial evidence. And she hasn't challenged the other reasons that the ALJ cited. So Ennis-Hastings hasn't shown that the ALJ erred when evaluating Dr. Cales's opinion.

Next, Ennis-Hastings challenges the ALJ's evaluation of her mental health provider, DeWanna Hull. Doc. 7, at 13. The ALJ detailed all of Hull's findings, Tr. 33, before concluding:

> This opinion is not persuasive for several reasons. First, the opinion is inadequately supported, as the limited treatment notes contained in the record pertaining to treatment with Ms. Hall are entirely absent references to abnormal mental status findings on examination to support the extreme limitations contained in Ms. Hall's opinion (Exhibit 15F). Furthermore, the opinion is inconsistent with the remaining evidence of record, which confirms major depressive disorder, generalized anxiety disorder, PTSD, OCD, and eating disorder, with an occasionally guarded demeanor, tense posture, fidgeting, abnormal mood and affect, and occasionally ruminative thoughts, but normal alertness and orientation, polite, cooperative, engaged behavior/demeanor, good hygiene/grooming, normal speech, otherwise normal thoughts, intact memory, attention, concentration, and cognition, average estimated intelligence, and good insight and judgment on examination (Exhibit 1F, 3F, 5F, 19F, 20F). Because the extreme limitations are inconsistent with the mild to moderate psychiatric abnormalities on examinations contained in the record, Ms. Hall's opinion is not persuasive.

Tr. 33.

Ennis-Hastings doesn't challenge the ALJ's finding that Hull's opinion was inadequately supported by Hull's own records. Rather, Ennis-Hastings challenges the ALJ's finding that Hull's opinion was inconsistent "with the mild to moderate psychiatric abnormalities" on objective exams in the record. Doc. 7, at 14. In support of her argument, Ennis-Hastings recounts evidence in

the record, some of which she didn't cite in the *Facts* section of her brief in violation of the Court's initial order. *See, e.g.*, Doc. 7, at 15 (citing Tr. 1623, a treatment note from September 28, 2021). Ennis-Hastings cites her reports of symptoms, *id.* at 14–15, but that evidence isn't responsive to the ALJ's stated reason for relying on Ennis-Hastings's objective exam findings.[10] The only objective exam findings that Ennis-Hastings cites is a depressed or anxious mood. *Id.* at 14. But the ALJ acknowledged that Ennis-Hastings had at times an "abnormal mood and affect." Tr. 33; *see also* Tr. 21, 22, 27, 28, 30, 32. The ALJ explained why, despite those findings, she found unpersuasive Hull's opinion. Tr. 33. Ennis-Hastings doesn't explain what about that conclusion she believes is erroneous.

Finally, Ennis-Hastings challenges the ALJ's evaluation of the state agency reviewers' opinions and argues that the opinions were rendered before the record was complete. Doc. 7, at 15. But the state agency reviewers aren't *treating sources*, so Ennis-Hastings's argument fails for that reason alone.

Even if the Court considers Ennis-Hastings's misplaced argument, it fails. This is so because state agency reviewers commonly base their opinions on an incomplete record. *See, e.g., Jones v. Colvin*, No. 5:13-cv-1781, 2014 WL

---

[10] Also, Ennis-Hastings's citations aren't accurate. For example, Ennis-Hastings states that "[d]uring her May 13, 2021 session, [she] exhibited symptoms of depressive symptoms, racing thoughts, anxiety, mood swings, and panic attacks (Tr. 1615)." Doc. 7, at 15. But at that visit, Ennis-Hastings stated that she "fe[lt] better" and "denie[d] … depressive symptoms, racing thoughts, anxiety, mood swings, and panic attacks at this time." Tr. 1615.

4594812, at *3 (N.D. Ohio Sept. 12, 2014) ("[b]ecause state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it") (quoting *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3rd Cir. 2011)). So long as the ALJ considered the subsequent evidence and "took into account any relevant changes in [the claimant's] condition," there is no error in the ALJ's reliance upon the state agency reviewers' opinions. *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009). Here, the ALJ considered evidence post-dating the state agency reviewers' opinions, Tr. 32, so there is no error, *see McGrew*, 343 F. App'x at 32.

### 3.   The ALJ did not err when she evaluated Ennis-Hastings's headaches at step three

Ennis-Hastings argues that the ALJ "failed to properly evaluate [Ennis-Hastings's] migraine headaches at Step Three." Doc. 7, at 16.

At step three of the disability evaluation process, a claimant will be found disabled if his or her impairments meet or equal one of the listings in the Listing of Impairments.[11] 20 C.F.R. § 404.1520(a)(4)(iii). The claimant

---

[11]    The "listings" are found at 20 C.F.R Part 404, Subpart P, App. 1. They are a catalog of disabling impairments organized by "body systems." Generally, each body system section has an Introduction, which contains information relevant to that system, and a Category of Impairments, which contains each numbered listing. Each listing describes the objective medical and other findings needed to satisfy the criteria of that listing. *Id*.; 20 C.F.R. § 404.1525.

bears the burden of establishing that any condition meets or equals a listing. *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 727–28 (6th Cir. 2004) (citing *Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987)). A claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker*, 93 F. App'x at 728 (citing *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987)). "Each listing specifies the objective medical and other findings needed to satisfy the criteria of that listing" and a claimant "must satisfy all the criteria to 'meet' the listing." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). "[A] claimant is also disabled if her impairment is the *medical equivalent* of a listing[.]" *Id.* There is no heightened articulation standard at step three. *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006).

"Primary headache disorder is not a listed impairment," but *a primary headache disorder*, "alone or in combination with other impairment[s], [may] medically equal[] a listing." Soc. Sec. Ruling 19-4p, 2019 WL 4169635, at *7 (S.S.A. Aug. 26, 2019). Listing 11.02, epilepsy, is the "most closely analogous listed impairment" for a *primary headache disorder*. *Id.* Ennis-Hastings argues that she satisfies Listing 11.02B. Doc. 7, at 16–17. Listing 11.02B requires:

> dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and

25

> duration to the criteria in 11.02B, we consider: A
> detailed description from an [acceptable medical
> source] of a typical headache event, including all
> associated phenomena (for example, premonitory
> symptoms, aura, duration, intensity, and
> accompanying symptoms); the frequency of
> headache events; adherence to prescribed
> treatment; side effects of treatment (for example,
> many medications used for treating a primary
> headache disorder can produce drowsiness,
> confusion, or inattention); and limitations in
> functioning that may be associated with the primary
> headache disorder or effects of its treatment, such as
> interference with activity during the day (for
> example, the need for a darkened and quiet room,
> having to lie down without moving, a sleep
> disturbance that affects daytime activities, or other
> related needs and limitations).

Soc. Sec. Ruling 19-4p, 2019 WL 4169635, at *7.

As an initial matter, Ennis-Hastings's counsel didn't allege at the hearing that Ennis-Hastings's headaches, or any other impairment, satisfied a listed impairment. Tr. 68–69 (counsel's closing remarks). So the ALJ was not required to discuss Listing 11.02. *See, e.g., McGeever v. Comm'r of Soc. Sec.*, No. 1:18-cv-477, 2019 WL 1428208, at *7 (N.D. Ohio March 29, 2019) ("Where the claimant does not mention the particular Listing at the hearing before the ALJ, the Sixth Circuit has found that the ALJ is not obligated to discuss that particular Listing") (collecting cases).

Nevertheless, Ennis-Hastings hasn't shown that the ALJ erred when she evaluated her headaches at step three. The ALJ cited Social Security Ruling 19-3p and Listing 11.02B and accurately stated that no medical source opined that Ennis-Hastings's headaches medically equally Listing 11.02. Tr.

26

19 (citing the state agency reviewers' opinions considering Listing 11.02, Tr. 101, 112); *see also* 20 C.F.R. § 404.1526(c) (the ALJ considers state agency reviewers' opinions when determining whether an impairment medically equals a listing); *Mott v. Comm'r of Soc. Sec.*, No. 1:21-cv-10, 2022 WL 2162803, at *23 (N.D. Ohio Apr. 18, 2022) (the ALJ properly relied on the fact that no acceptable medical source opined that the claimant's impairment medically equaled Listing 11.02B), *report and recommendation adopted,* 2022 WL 1616537 (N.D. Ohio May 23, 2022). The ALJ stated that Ennis-Hastings didn't satisfy Listing 11.02B and explained:

> In this case, the record contains reports of persistent migraine headaches with nausea and sensitivity to light and sound, despite treatment, consisting of use of medications prescribed by a treating neurologist (Exhibit 2F, 4F, 7F, 9F, 10F, 11F, 14F, 16F, 17F, Hearing Testimony). However, the record indicates some positive response to medication and treatment (see Exhibit 4F/7), and is absent evidence of side effects with recent medication, or a need for frequent emergency department treatment for persistent headaches (See Exhibit 2F, 4F, 7F, 9F, 10F, 11F, 14F, 16F, 17F). For these reasons, the undersigned concludes that the claimant's primary headache disorder fails to satisfy 11.02B.

Tr. 20; *see also* Tr. 29–30 (ALJ describing Ennis-Hastings's positive responses to medication, which improved Ennis-Hastings's symptoms "in as little as 15 minutes").

Ennis-Hastings argues that "even with a positive response [to medication], she was still having migraine headaches three times a week." Doc. 7, at 17. But the ALJ explained that the severity of Ennis-Hastings's headaches

didn't require emergent treatment for persistent headaches. Tr. 20. And later in the decision, the ALJ found that the severity of Ennis-Hastings's symptoms were not as severe as alleged, explaining:

> the claimant has admitted improvement with conservative treatment, including use of headache medications (*See* Exhibit 4F/7). The claimant has not sought more extensive treatment modalities such as acupuncture, chiropractic treatment, injection therapy, massage therapy, Botox injections, or use of a TENS unit, …. Diagnostic imaging/testing has revealed generally mild abnormalities at most, and the claimant has not required frequent emergency treatment or hospitalization for her reportedly debilitating persistent pain.

Tr. 31; *see Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (reversal is unwarranted when the ALJ's conclusion at step three is sufficiently supported by factual findings elsewhere in the decision); *see also Mott*, 2022 WL 2162803, at *23 ("the question is not whether [Mott] was diagnosed with migraines, and it is not whether she ever had a migraine while taking medication. The question addressed by the ALJ in his analysis of … Mott's headaches at Step Three was whether [Mott's] headaches matched the frequency, severity, and unresponsiveness to treatment detailed in SSR 19-4p and Listing 11.02B."). The ALJ's evaluation of Ennis-Hastings's headaches at step three is supported by substantial evidence, so it must be affirmed. *See Jones*, 336 F.3d at 477.

The balance of Ennis-Hastings's step three argument contains boilerplate language without any attempt to develop an argument. Doc. 7, at

28

17–18. These arguments are forfeited. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citations omitted).

In her reply brief, Ennis-Hastings cites *Harris v. Comm'r of Soc. Sec.*, No. 1:22-cv-1538, 2023 WL 4078807, at *15 (N.D. Ohio Apr. 26, 2023), and concludes, "[t]his Court previously remanded a matter so the ALJ could properly evaluate whether Plaintiff's migraines equaled Listing 11.02…. As in *Harris*, the ALJ's determination in this matter was also not supported by substantial evidence and this matter should be remanded[.]" Doc. 12, at 2. Ennis-Hastings's failure to explain how this case aligns with the facts in *Harris* is fatal to her argument. *See McPherson*, 125 F.3d at 995–96.

### 4.     The ALJ complied with Social Security Ruling 16-3p

Ennis-Hastings argues that the ALJ didn't comply with Social Security Ruling 16-3p when she evaluated Ennis-Hastings's alleged symptoms. Doc. 7, at 18. To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ considers medical evidence, the claimant's statements, other information provided by medical sources, and any other relevant evidence in the record. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *4 (Oct. 25, 2017); 20 C.F.R. § 404.1529. Other relevant evidence includes:

daily activities; the location, duration, frequency, and intensity of pain or symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication; treatment, other than medication, to relieve pain; any measures used to relieve pain; and "[o]ther factors concerning … functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. § 404.1529(c). "The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence." *Hatcher v. Berryhill*, No. 1:18-cv-1123, 2019 WL 1382288, at *15 (N.D. Ohio Mar. 27, 2019) (citing *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp.2d 724, 733 (N.D. Ohio 2005)). The ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *10.

After citing Social Security Ruling 16-3p and asserting that the ALJ didn't comply with it, Ennis-Hastings spends over three pages reciting evidence in the record, some of which she didn't cite or discuss in the *Facts* section of his brief in violation of the Court's Initial Order.  Doc. 7, at 19–22. Then, string-citing 22 pages of the record, Ennis-Hastings asserts that "[t]hroughout her examinations, [she] complained of fatigue." *Id.* at 22. Ennis-Hastings submits, "[t]his Court remanded a matter where the claimant consistently complained to her doctors of fatigue, but the ALJ did not explicitly

evaluate whether claimant experienced severe fatigue or even address fatigue specifically." *Id.* (citing *Tenney v. Comm'r of Soc. Sec.*, No. 4:20-cv-1569, 2021 WL 4393538, at *9 (N.D. Ohio Sept. 7, 2021), *report and recommendation adopted*, 2021 WL 4391228 (N.D. Ohio Sept. 24, 2021)). But in *Tenney*, the issue was whether the claimant satisfied the requirements in Listing 14.10A, *Sjogren's syndrome*, which requires a finding of "severe fatigue." 2021 WL 4393538, at *7–9. Here, Ennis-Hastings hasn't shown that a finding of fatigue is required by any relevant listing.[12] Moreover, the ALJ acknowledged Ennis-Hastings's reports of fatigue, Tr. 24, 32, as Ennis-Hastings concedes, Doc. 7, at 22. The ALJ pointed out that despite allegations of fatigue and other symptoms, Ennis-Hastings's exams showed a "normal range of motion, generally full strength, intact coordination, negative straight leg raising, … consistently independent ambulation on examination … generally mild to unremarkable findings on diagnostic imaging/testing, and extremely conservative scope of medical treatment." Tr. 33; *see also* Tr. 29–32.

Next, Ennis-Hastings cites her "repeated[] complain[ts] of bilateral hand and foot numbness" and string-cites to 26 pages in the record, including pages she hadn't included in the *Facts* section of her brief. Doc. 7, at 22. Ennis-Hastings concedes that the ALJ discussed her hand and foot numbness, but alleges that the ALJ "failed to account for these difficulties when forming the

---

[12]     Indeed, in the *Facts* section of her brief Ennis-Hastings only mentions fatigue once. Doc. 7, at 4.

RFC." *Id*. But the ALJ expressly limited Ennis-Hastings to frequent handling and fingering due to her "decreased upper extremity sensation," and assessed postural and environmental restrictions due to her "decreased sensation [and] occasionally decreased lower extremity strength." Tr. 29. Aside from disagreeing with the ALJ's conclusion, Ennis-Hastings hasn't shown that the ALJ committed an error.

Ennis-Hastings's remaining boilerplate assertions, Doc. 7, at 23–24, are not developed and are forfeited.

**Conclusion**

For the reasons explained above, I recommend that the Commissioner's decision be affirmed.

Dated: September 19, 2023

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).